UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

TEXTRON FINANCIAL :
CORPORATION :
 :
    v. : C.A. No. 10-218M
 :
GROUSE, LLC, et al. :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

    Plaintiff Textron Financial Corporation ("TFC") entered into a Credit and Security Agreement (the "Agreement") with Defendant Grouse, LLC ("Grouse") on June 13, 2006 to secure financing for mobile homes purchased by Grouse as inventory for resale. The Agreement was also the subject of payment and performance guaranty agreements executed separately by Defendants Richard J. Klarchek, Capital Home Sales, LLC, and Capital First Realty, Inc.[1]

    TFC commenced this action on May 14, 2010 alleging that Grouse was in default of its payment obligations under the Agreement and that Klarchek, Capital Home Sales and Capital First Realty, were also liable for such default as contractual guarantors. (Document No. 9). Currently pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B); LR Cv 72(a)) is TFC's Motion for Summary Judgment as to Grouse (Count I) and Capital First Realty (Count IV). (Document No. 20). Defendants Grouse and Capital First Realty oppose the Motion. (Document Nos. 23 and 32). A hearing was held on October 25, 2011. For the following reasons, I recommend that TFC's Motion be GRANTED.

---

[1] Defendants Klarchek and Capital Home Sales, LLC, are the subject of bankruptcy proceedings and thus this case is presently stayed as to them.

**Facts**

The following facts are taken from the parties' Local Rule Cv 56(a) statements and counter-statements. (Document Nos. 21, 25, 26 and 29).

On or about June 13, 2006, Grouse entered into a Credit and Security Agreement (the "Agreement") with TFC, pursuant to which TFC agreed to make financial accommodations and advance funds on behalf of Grouse for the purchase of manufactured homes and certain other collateral in exchange for, inter alia, a security interest in Grouse's equipment and inventory. The Agreement is a valid and enforceable contract. Under the terms of the Agreement, an event of default occurs when "any of [Grouse's] obligations to [TFC] under this Agreement...or any other agreement are not paid or performed as required."

In conjunction with Grouse's execution of the Agreement, Capital First and certain other persons and entities executed individual Guaranties. On June 13, 2006, Capital First entered into the Capital First Guaranty to induce TFC to enter into the Agreement with Grouse. The Capital First Guaranty is a valid and enforceable contract. Under the terms of the Capital First Guaranty, Capital First unconditionally and irrevocably guaranteed to TFC "the prompt payment and/or performance of all indebtedness, obligations and liabilities of [Grouse] at any time owing to [TFC]." Capital First also agreed that "[i]f Grouse defaults in the payment or performance of any Guaranteed Obligation...[Capital First] shall pay to [TFC] the sums which [Grouse] is obligated to pay to [TFC], whether by acceleration or otherwise." In addition to the Agreement, on June 28, 2006, Grouse agreed to certain Program Terms that are incorporated by reference in the Agreement. The June 28, 2006 Program Terms were subsequently amended on January 30, 2008 with an effective date of January 1, 2008. Under the January 30, 2008 Program Terms, the parties agreed as follows:

> No curtailments will be billed so long as inventory greater than 18 months old from invoice date does not exceed 15% of total outstandings. This 15% limit will apply to units/invoices purchased on or after January 1, 2008. The total outstanding calculation will be based on any and all inventory on [Grouse's] Floorplan. If the 15% level is exceeded at any time, [Grouse] is required in each case, as and when billed, to pay the amount necessary to return to compliance with this requirement.

Subsequent to January 1, 2008, inventory greater than 18 months old from the invoice date exceeded 15% of the total outstandings. Based on that, TFC argues that Grouse was required "to pay the amount necessary to return to compliance with this requirement." Defendants deny that Grouse was responsible for paying curtailments or other billings to TFC except when a mobile home that was serving as collateral was sold.

On or about October 20, 2009, TFC sent Grouse a letter claiming that TFC had not received the curtailment payments required by the Agreement. TFC also informed Grouse that the outstanding curtailments totaled $787,681.00 and made demand on Grouse to pay the outstanding curtailment amount in full no later than December 16, 2009. TFC also advised Grouse that its previous interest payments were untimely and reminded Grouse that payments received after the end of the month will result in default rates assessed on its account. Finally, TFC advised Grouse that it had breached several performance obligations under the terms of the Agreement. By a letter dated December 7, 2009, Grouse did not directly dispute the existence of the payment defaults due to its failure to make the required curtailment payments, and indicated that it was seeking "a new floor plan lender" and requested "an extension in regard to the curtailment payments."

On January 28, 2010, TFC sent Grouse a second letter, informing it that TFC had not received the outstanding curtailment payments from Grouse by the December 16, 2009 deadline, and that it had not received the required curtailment payments that came due after that date from Grouse.

TFC informed Grouse of TFC's position that Grouse remained in default of its obligations to TFC. TFC's letter to Grouse was also sent to Capital First, as guarantor, informing it of the claimed default of Grouse. On May 10, 2010, TFC sent its final demand to Grouse. TFC's May 10, 2010 letter informed Grouse that it failed to cure the events of default claimed in the October 20, 2009 and January 28, 2010 letters and, as a result of that failure, TFC accelerated the maturity of all obligations owed under the Agreement and other loan documents. TFC demanded that Grouse pay to TFC $5,168,943.04, which amount consisted of $5,137,977.45 in principal and $30,965.59 in interest and other charges accrued through April 30, 2010. TFC also sent its letter to Capital First, as guarantor, and made demand upon Capital First for the same total amount.

On August 20, 2010, TFC commenced an action for replevin against Grouse in the United States District Court for the Northern District of Illinois. Textron Financial Corp. v. Grouse, LLC, Case No. 1:10-cv-05273 (N.D. Ill.) On September 29, 2010, the Northern District of Illinois granted TFC's motion for an order of replevin, expressly finding, for purposes of replevin only, that Grouse had defaulted under the Agreement by "failing to make timely payments when due, including without limitation, failing to pay [TFC] the principal balance on matured units (due in full after 24 months from initial financing) and failing to make monthly interest payments when due." The collateral has been sold and applied by TFC to Grouse's alleged indebtedness.

**Standard of Review**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the pertinent evidence is such that a rational fact finder could render

a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citing Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, 43 F.3d at 735. Once the movant has made the requisite showing, the "non-moving party may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial." Okpoko v. Heinauer, No. 10-43S, 2011 WL 835598, *15 (D.R.I. March 3, 2011). The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

**Discussion**

The sole issue is whether TFC has established the absence of any genuine issue of material fact as to Grouse's default under the Agreement (Count I) and Capital First Realty's breach of its guaranty (Count IV).[2] Defendants argue that certain provisions in the operative documents are "inherently inconsistent" and, drawing all reasonable inferences in their favor as the Court must under Rule 56, these inconsistencies preclude the entry of summary judgment. In particular, Defendants contend that the documents can be read to provide that Grouse's payment obligation is only triggered when a mobile home is sold. They also contend that there are "inherently inconsistent

---

[2] Defendants initially contested TFC's damages calculation arguing that TFC had not established as a matter of law that its disposition of the collateral was commercially reasonable and that the proceeds were properly applied to the balance due. (Document No. 23 at pp. 7-9). However, after being granted leave to conduct discovery on these issues under Fed. R. Civ. P. 56(d)(2) and doing so, Defendants filed a Supplemental Memorandum which represents that they "do not contest the commercial reasonableness of the sale of the collateral nor the determination of the amount due if (and only if) TFC is ultimately successful on its claims." (Document No. 32 at p. 2).

or ambiguous terms" in the Agreement and related documents which preclude a finding that Grouse was contractually obligated to make the curtailment payments demanded by TFC.

Defendants' opposition smacks of a last-ditch effort to delay the entry of a substantial monetary judgment against them. While courts must exercise caution in entering summary judgment so that a party is not improperly deprived of the right to a trial on a truly disputed issue of material fact, the dispute must be "genuine" and not manufactured since the underlying purposes of Rule 56 include the promotion of the efficient disposition of cases and the avoidance of unnecessary trials. See generally 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2712 (2011). In discussing Rule 56, the First Circuit has capsulized the standard by evaluating whether a party has presented a "trialworthy" issue. See, e.g., Ahern v. Shinseki, 629 F.3d 49, 55 (1st Cir. 2010).

For the following reasons, I conclude that Defendants have not presented any "trialworthy" issues in this case. Defendants do not dispute the validity of the Agreement in issue and do not contend that they have paid or been excused from paying the amounts Grouse borrowed from TFC. In fact, it is undisputed that Defendants' December 7, 2009 response to TFC's notice of default did not dispute liability or default. (Document No. 22-5). Rather, the response advised TFC that

> [W]e are still actively seeking a new floor plan lender but given the current market conditions we have still been unsuccessful. Again, we respectfully request an extension in regard to the curtailment payments. These are difficult times and we are doing everything we can to meet our obligations.

Id. at p. 3. Subsequently, TFC commenced a replevin action against Grouse in the Northern District of Illinois to take possession of the collateral held by Grouse, and Grouse did not contest. See Textron Financial Corp. v. Grouse, LLC, Case No. 1:10-cv-05273 (N.D. Ill.). Grouse stipulated in

that action "for purposes of Replevin only, due to Grouse's default under the Agreement for failing to make timely payments when due, including without limitation, failing to pay [TFC] the principal balance on matured units (due in full after twenty-four months from initial financing) and failing to make monthly interest payments when due, the collateral is being wrongfully detained by Grouse." Id. at Document No. 22 (Replevin Order dated September 29, 2010).

TFC persuasively argues that the loan documents require payment under three distinct circumstances. First, payment is required when a secured mobile home is sold. Second, if inventory ages to the point where inventory greater than eighteen months old exceeds 15% of "total outstandings," then principal reduction payments (i.e., curtailments) must be made by Grouse in the amount necessary to reduce the amount below 15%. Finally, the loan documents contain an outside maturity term of twenty-four months, or payment "due in full day 721."[3] Defendants counter that "Grouse was only responsible for repaying TFC as it sold mobile homes, and not on any other basis." (Document No. 24, ¶ 13). (emphasis added). They also dispute any contractual obligation to make curtailment payments. Id., ¶¶ 20-21.

Both the Agreement and the Guaranty expressly provide that they shall be governed and construed in accordance with the laws of the State of Rhode Island. (Document No. 9, Exs. 1 and 4). Thus, the dispute presented turns on the interpretation of a contract under Rhode Island law. "Under Rhode Island law, a court's objective in construing contractual language is to determine the parties' intent." URI Cogeneration Partners, LP v. Board of Governors for Higher Education, 915 F. Supp. 1267, 1281 (D.R.I. 1996) (citing Johnson v. Western Nat. Life Ins. Co., 641 A.2d 47, 48

---

[3] In its Reply (Document No. 28 at p. 6, n.1) and at the hearing, TFC alternatively contends that Defendants' arguments as to "pay as sold" and curtailments are effectively moot because Grouse's liability has matured under the loan documents and Grouse failed to pay within the 720-day term. Thus, TFC argues that Grouse is in default separate and distinct from its failure to make curtailment payments. Defendants have not specifically countered this argument.

(R.I. 1994)). "'Where the language of a contract is clear and unambiguous, the Rhode Island Supreme Court has generally interpreted the parties' intent based solely on the written words,' and accord unambiguous words their 'plain and natural meaning.'" Feinstein v. Brown, 432 F. Supp. 2d 258, 269 (D.R.I. 2006) (quoting In re Newport Plaza Assocs., LP, 985 F.2d 640, 645 (1st Cir. 1993)). A contract is ambiguous and presents a question of fact only if "it is reasonably and clearly susceptible to more than one interpretation." McBurney v. Teixeira, 875 A.2d 439, 443 (R.I. 2005).

Although the loan documents in this case are somewhat confusing, they are not ambiguous particularly when viewed in the context of the parties' agreements as a whole. See In re Newport Plaza Assocs., LP, 985 F.2d at 646 (court is duty bound under Rhode Island law to construe contractual terms in the context of the contract as a whole). As noted above, Defendants argue that "Grouse was only responsible for repaying TFC as it sold mobile homes, and not on any other basis." (Document No. 24, ¶ 13) (emphasis added). Defendants primarily rely upon one line in the document entitled "Program Terms" dated June 28, 2006 which provides "Repayment Terms: Pay as Sold." (Document No. 24 at p. 6). Defendants propose a nonsensical interpretation of these loan documents. See Anglo American Ins. Co., Ltd. v. Shooters at India Point, Inc., 959 F. Supp. 115, 118 (D.R.I. 1997) (recognizing the "canon that contracts should not be construed in a manner that renders them nonsensical"). It is nonsensical that a sophisticated lender would enter into a multi-million dollar inventory financing arrangement and only be entitled to repayment when the borrower sold an item of secured inventory. If repayment was only required "as sold," then the borrower could forever delay repayment simply by abandoning its sale efforts which it might do if there was a precipitous drop in prices or demand. That simply makes no sense.

In addition to being nonsensical and contrary to the plain intent reflected in the Agreement, Defendants' "pay as sold" argument would impermissibly render meaningless other provisions of the Agreement. See Angelo American Ins. Co., 959 F. Supp. at 117 (recognizing "one of the cardinal principles of contract construction, namely, that whenever possible the terms of the contract should be construed to be consistent with one another"); and Cohen v. Steve's Franchise Co., Inc., 927 F.2d 26, 29 (1st Cir. 1991) ("A reading rendering contract language meaningless is to be avoided.") (applying Mass. law). If "pay as sold" was the only repayment trigger as argued by Defendants, then the "curtailments/maturity" language set forth in both the Program Terms dated June 28, 2006 and First Amendment to Program Terms dated January 30, 2008 and agreed to be Grouse would be rendered meaningless. (See Document No. 24 at pp. 6 and 9). Moreover, there is nothing patently inconsistent about a loan agreement which requires payment when a secured piece of inventory is sold but also requires partial repayment (i.e., a curtailment) as inventory ages beyond a certain point and has an outside maturity date for repayment.

Finally, Defendants argue that the operative loan documents do not define the term "curtailment" and that, based on a definition of curtailment in the Klarchek Guaranty, "there could be no 'curtailments' for Grouse to pay to TFC." (Document No. 23 at p. 7). The Klarchek Guaranty, unlike the other Guaranties and the loan documents, contains a specific definition of "curtailments" as "principal payment reduction requirements as outlined by applicable manufacturer repurchase agreements."[4] (Document No. 9-2 at pp. 5-6). However, Defendant Klarchek is subject to bankruptcy proceedings, and TFC has not moved for summary judgment on the Klarchek

---

[4] The parties dispute whether the mobile homes in question were subject to "manufacturer repurchase agreements." Compare Document No. 24, ¶¶ 19-20 with Document No. 30, ¶ 2. However, since that language is not in the Agreement or the Capital First Guaranty, it is not presently before the Court and is not material to the resolution of TFC's Motion as to Counts I and IV.

Guaranty and cannot due to the automatic stay. Thus, the Klarchek Guaranty is not under consideration in this Motion. Although the Klarchek Guaranty may include additional specificity or conditions in defining the scope of "Guaranteed Obligations" thereunder, the operative loan documents plainly provide for the billing of "curtailments" and define when and how such curtailment amounts will be calculated and billed. (Document No. 24 at pp. 6 and 9). The fact that a contract term is not defined does not automatically render it ambiguous. See Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc., 852 A.2d 535, 542 (R.I. 2004) (An undefined term in a contract should be given its "plain, ordinary, and usual meaning" and a dictionary may be used to aid in finding that meaning); see also George's Inc. v. Allianz Global Risks U.S. Ins. Co., 596 F.3d 989, 993 (8th Cir. 2010) (A contract term is not ambiguous simply because it is undefined.). As detailed in TFC's Reply, the term "curtail" commonly means to reduce something or cut it short. (Document No. 28 at p. 4). Here, the use of the term "curtailments" in the context of additional billings when unsold inventory ages to a certain point makes it reasonably clear that such payments are directed at principal and are not interest or other penalties. In fact, even the Klarchek Guaranty defines curtailments, in part, as "principal payment reduction." Moreover, when TFC advised Grouse that it was in arrears as to "required curtailment payments," Grouse did not respond by contending that it did not know what a "curtailment payment" was or that such payments were not contractually "required." Rather, Grouse advised that it was seeking a new lender and "respectfully request[ed] an extension in regard to the curtailment payments." (Document No. 22-5 at p. 3). There is no ambiguity and the parties plainly were on the same page as to the meaning of curtailments.

After thoroughly reviewing the parties' submissions, I conclude that TFC has established entitlement to judgment as a matter of law as to Counts I and IV and that Defendants' claims of inconsistencies and ambiguities in the loan documents are unsupported, contradicted by the plain and unambiguous meaning of such documents, and insufficient to establish the presence of a genuine issue of material fact precluding the entry of summary judgment.

**Conclusion**

For the foregoing reasons, I recommend that TFC's Motion for Summary Judgment (Document No. 20) be GRANTED as to Count I (Defendant Grouse, LLC) and Count IV (Defendant Capital First Realty, Inc.).

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
November 9, 2011